## IN THE U.S. DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| TRENT HUNTER, on behalf of himself and others similarly situated, | Case No.: 23-cv-2694 |
| Plaintiff, | |
| v. | JURY TRIAL DEMANDED |
| CREED TRANSPORT, INC. | |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiff Trent Hunter brings this case individually and on behalf of all others similarly situated against Defendant Creed Transport, Inc. ("Creed") for breach of contract, fraud, violations of the Truth In Leasing Act ("TILA"), 49 U.S.C. § 14704(a)(2), and violations of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/10a. Plaintiff brings his claims as a putative class action pursuant to Fed. R. Civ. P. 23(b)(3).

### Introduction

1. Defendant Creed is a transportation carrier licensed with the Department of Transportation and Federal Motor Carrier Safety Administration ("FMCSA").

2. Defendant engaged in a scheme to defraud owner-operators/lessors with whom they contract to steal part of their compensation. Plaintiff Trent Hunter worked for Defendant as an owner-operator/lessor, using a truck to transport loads in interstate commerce. Defendant executed an agreement with Hunter to lease his equipment ("Lease Agreement") and pay him 88% of the gross price (or "rate") of each load he transported for Defendant.

3. Instead of paying the contractually promised amounts, Defendant secretly altered the third-party brokers' load confirmation documents to reduce the actual rate (price) of each load, shared only the altered versions of the load confirmation documents with Plaintiff, and then paid Plaintiff only 88% of the fraudulently reduced load price. Defendant also breached its Lease Agreement with Plaintiff by engaging in this illegal practice.

4. Additionally, Defendant violated Plaintiff's rights under the Truth in Leasing Act ("TILA"), 49 U.S.C. § 14704(a)(2). The TILA governs the terms and conditions under which owner-operator truckers, such as Hunter, lease equipment to federally authorized motor carriers that transport freight in interstate commerce. *Id.* TILA regulations require the motor carrier's equipment lease to disclose all expenses that the carrier will "charge back to the operator" and all escrow payments that the owner-operator will make to the motor carrier. 49 C.F.R. § 376.12(h) & (k). The regulations also require the lease to "clearly state[]," in writing, the amount that the motor carrier will pay the owner-operator as compensation. *Id.* § 376.12(d). If an owner-operator's compensation is based on a percentage of the gross receipts of the load, then the carrier must provide the owner operator with copies of the original brokers' load confirmations sheets for each load at or before the time of settlement. *Id.* § 376.12(g). Finally, the carrier must abide by its lease agreement with the owner operator. *Id.* (intro paragraph).

5. Defendant violated the TILA, including, by not providing Plaintiff with the original brokers' load confirmation sheets, and not paying Plaintiff at the percentage rate promised in the Lease Agreement.

6. On information and belief, Defendant's foregoing illegal practices are widespread and universally applied to each individual and business with whom Defendant has contracted to transport goods. Defendant has also executed substantively identical Lease Agreements with over

one hundred other individuals and businesses. Plaintiff brings this action on behalf of himself and all others similarly situated to seek monetary damages and declaratory, injunctive, and other equitable relief.

## Parties

7. Plaintiff Trent Hunter, an Indiana citizen, is an interstate truck driver with over seven years of experience in the transportation industry. He signed a Lease Agreement with Defendant Creed. He has a CDL Class A license and worked for Defendant, under its direction and control, from April 2020 to November 2022.

8. Defendant Creed Transport, Inc. is an Illinois business corporation with a principal office located at 6502 Joliet Road, Suite F, Countryside, Illinois 60525 and a principal place of business in DuPage County, Illinois.

9. Defendant Creed is a federally regulated motor carrier engaged in providing transportation services to the shipping public and is an "authorized carrier" within the meaning of 49 C.F.R. §376.2(a).

10. Creed employs or contracts with drivers to transport its customers' freight in interstate commerce. As part of its business, Creed leases equipment from owner-operators.

11. Creed is registered under Motor Carrier ("MC") number MC-0231522 and US DOT # 2999221. According to the SAFER - FMCSA management information system, Creed reported that it operated 66 power units (semi-trucks) and 66 drivers and reported that it ran approximately 3.691 million miles in 2021 and 4.692 million miles in 2022.

## Jurisdiction and Venue

12. The Court has subject matter jurisdiction over this action pursuant to the TILA, 49 U.S.C. § 14704.

13. The Court also has diversity jurisdiction over this action under 28 U.S.C. 1332(a)(1), and jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d).

14. Venue is proper in this jurisdiction under 18 U.S.C. § 1965(a) and 28 U.S.C. §1391(a), (b), and (c) because Defendant resides in the Northern District of Illinois and all defendants are residents of Illinois, Defendant transacts its affairs in the Northern District of Illinois, and a substantial part of the events and omissions giving rise to this action occurred in the Northern District of Illinois.

## TILA Legal Standards

15. The TILA and its implementing regulations govern the terms and conditions under which owner-operator truckers lease equipment to federally authorized motor carriers that transport freight in interstate commerce. *See* 49 U.S.C. § 14102(a); 49 C.F.R. § 376.12. The TILA regulations require the motor carrier's equipment lease to disclose, in writing, the amount that the motor carrier will pay the owner-operator as compensation. 49 C.F.R. § 376.12(d). When the lessor's revenue is based on a percentage of the gross revenue for a shipment, the lease must specify that the carrier will provide the lessor a copy of the rated freight bill, or any other documentation used for a shipment containing the same information, at or before the time of settlement. *Id.* at 376.12(g). Finally, the regulations require the motor carrier to adhere to the terms of the lease. *Id.* § 376.12 (introductory paragraph).

## Common Facts

16. Plaintiff Hunter worked for Defendant as an owner-operator for purposes of the TILA regulations. 49 C.F.R. § 376.2.

17. Plaintiff signed an Independent Contractor Agreement (hereinafter "Lease Agreement") with Creed to "lease" the truck to Creed for the purpose of transporting goods. This was the lease required by 49 C.F.R. § 376.11.

18. The Lease Agreement constitutes a "lease" under the TILA rules and is subject to their regulations. 49 C.F.R. § 376.2(e).

19. Under the Lease Agreement, Creed, as the authorized carrier, holds the federal motor carrier operating authority needed to provide services for the transport of non-exempt goods in interstate commerce. Plaintiff leased his equipment to Defendant for the purpose of transporting goods through interstate commerce under Defendant's licenses and permits.

20. Defendant contracted with Plaintiff and Class members through Lease Agreements substantially identical to the one attached here as **Exhibit A**.

21. In the Lease Agreements, Defendant promised to pay Plaintiff and Class members 88% of the gross receipts for each load. The Lease Agreement states, "CARRIER agrees to pay 88% (to hold 12% commission) of gross receipts of each load …" **Ex. A.**

22. Paying based on a percentage of the price is the trucking industry's dominant model of compensating owner-operators who lease their trucks. As of 2021, three out of every four leased owner operators were paid based on a percentage of the carrier's revenue for each load, as opposed to other payment methods such as hourly and per mile.[1]

23. Defendant lied and under-reported the load price (or "rate") of Plaintiff's loads in Plaintiff's pay statements and in the falsified brokers' load confirmation sheets it gave to Plaintiff.

---

[1] Driver compensation, part 3: Percentage is king for leased owner-operators, long after the rise of miles post-deregulation, OVERDRIVE (July 21, 2021) https://www.overdriveonline.com/business/article/15066619/compensation-percentage-paydominates-among-ownerops (article archived at https://archive.is/tgWGE).

24. When Defendant received a load confirmation sheet from a broker, Defendant electronically altered the document to lower the stated price of the load and forwarded the fake load confirmation sheet to Plaintiff. The altered documents were on the original third-party broker's letterhead. That way, the owner operators were led to believe the load price was less than the price Defendant's customers were actually paying it to transport the load.

25. Defendant directly pocketed the portion of gross receipts it concealed from Plaintiff and paid him their promised portion of 88% on the lower, underreported amount. For example, on August 11, 2022, Hunter received a secretly altered load confirmation between Defendant and broker C.H. Robinson by email from Defendant's dispatcher for a load to pick up on August 11, 2022, and drop off on August 12, 2022. The falsified load confirmation stated that the price of the load was $1,400. **Ex. B.** Later, in September 2022, Hunter received a copy of the unaltered load confirmation directly from C.H. Robinson. This unaltered loan confirmation stated that the load price was not $1,400, but actually $1,600. **Ex. C.** Yet Defendant paid Hunter only 88% of the reduced load price of $1,400. Hunter relied on the falsified load confirmation to his detriment. He would not have agreed to take the load for $1,400 if he knew the shipper was actually paying Defendant $1,600 to transport the load.

26. Again, on October 12, 2022, Hunter received a secretly altered load confirmation between Defendant and broker C.H. Robinson by email from Defendant's dispatcher for a load to pick up on October 12, 2022, and drop off on October 13, 2022. The falsified load confirmation stated that the price of the load was $1,300. **Ex. D.** Yet Hunter obtained via email directly from C.H. Robinson the unaltered load confirmation, which stated that the load price was $1,400. **Ex. E.** Defendant paid Hunter only 88% of the reduced load price of $1,400. Hunter relied on the

falsified load confirmation to his detriment. He would not have agreed to take the load for $1,300 if he knew the shipper was actually paying Defendant $1,400 to transport the load.

27. Hunter first learned that Defendant had altered the load confirmation documents in or around fall 2022 because he called the broker of a shipment directly and asked for a copy of the load confirmation sheet. When the broker sent him the original load confirmation, it listed a different load price than the load confirmation he received from Defendant.

28. Hunter subsequently confirmed over the phone with a representative from C.H. Robinson, a broker used by Defendant, that Defendant misrepresented many additional load prices to Hunter by falsely representing to Hunter that the shipping customers agreed to pay Defendant a lower price than they actually did.

29. Hunter repeatedly inquired about the discrepancies with Defendant's personnel, including dispatchers, Defendant's Operations Manager, and even Defendant's President, Bratislav Milanovic. When Hunter heard from a driver of another carrier that C.H. Robinson had paid a higher rate, $1,600, for the same delivery route that he (Hunter) was driving for $1,300, Hunter texted with a Creed dispatcher, named Bonnie, about the discrepancy. The dispatcher lied to Hunter, telling him that the broker was paying Creed less now, which purportedly explained the reduced pay to Hunter. **Ex. F.** She assured Hunter that Creed "fight[s]" on behalf of their drivers for even that $1,300, and that it was a take it or leave it offer, because "we always have drivers who want[] to run." *Id.* Hunter asked the company's Operations Manager about the discrepancy as well, and he was told that Creed would not engage in a practice of keeping money that was owed to drivers. Hunter also confronted the President of the company, who refused to take Hunter's calls and eventually blocked his number.

30. Hunter terminated his contract with the company. Upon leaving, he requested the remittance slips to which he is entitled, but Defendant never responded to this request.

31. Plaintiff relied on Defendant's representations in the falsified load confirmation sheets believing that the falsified rates reflected the true amounts that brokers paid Defendant for the loads.

32. Defendant intentionally lied about the rates of Plaintiff's loads in order to convince Plaintiff to haul freight at a cheaper price than Defendant otherwise would have had to pay to him. By falsely informing Plaintiff that customers agreed to pay less money than they really agreed to pay for the loads, Defendant convinced Plaintiff to haul the loads under the mistaken belief that the prices represented true market rates.

33. Plaintiff executed his Lease Agreement with Defendant on the belief that Defendant would pay him 88% of the actual price that Defendant received for the loads.

34. Defendant violated the TILA rules by not adhering to the terms of its lease agreement. 49 C.F.R. § 376.12 (intro paragraph).

35. During the past five years alone, Defendant has collectively contracted with dozens or hundreds of lessors/owner-operators to provide transportation service for their clients.

36. On information and belief, Defendant executed substantively identical Lease Agreements with these drivers.

37. Defendant engaged in a regular practice of secretly altering their load confirmation sheets for all lessors/owner-operators with whom it contracts to falsify the load price, and then paying those lessors/owner-operators a percentage of the lower, secretly altered load price.

38. Defendant refused to provide Plaintiff with the original brokers' load confirmation sheets.

**Class Action Allegations**

39. Plaintiff brings this action on behalf of himself and the following class of similarly situated individuals or entities, defined as:

> All individuals or entities that that signed equipment leases with Defendant, were paid based on a percentage of the price of the load, and received altered third party broker load confirmations from Defendant between April 27, 2018 and the present.

40. The Class defined above satisfies the requirements of Rules 23(a) and 23(g).

    a. **Numerosity.** The Class is so numerous that joinder of all members is impracticable, and the disposition of their claims in a class action will provide substantial benefits to both the parties and the Court. Since 2018, Defendant has collectively executed Lease Agreements with over one hundred owner-operator drivers.

    b. **Commonality.** Common questions of law and fact predominate over individual issues affecting only individual class members. Questions of law and fact common to the Class include, among others, the following:

        i. Whether Defendant fraudulently represented to the Plaintiff and the Class that the gross receipts for a given load were lower than the amount actually collected by Defendant;

        ii. Whether Defendant intentionally deceived Plaintiff and the Class by lying to them about the gross receipts for loads they hauled and on which their compensation was based;

        iii. Whether Defendant intentionally deceived Plaintiff and the Class by providing them with altered versions of the brokers' load confirmation sheets;

      iv. Whether Plaintiff and the Class relied on Defendant's false statements about the price of the load to their detriment;

      v. Whether Defendant breached the terms of their equipment leases with owner-operator drivers by paying them less than the promised percentage of gross receipts on each load; and

      vi. Whether Defendant violated the TILA by failing to give Plaintiff and the Class the original, unaltered brokers' load confirmation sheet.

  c. **Typicality**. Plaintiff's claims are typical of the Class's claims because they and all Class members were injured through Defendant's uniform misconduct. The claims of Plaintiff and the Class arise from the same operative facts and are based upon the same legal theories. There are no defenses unique to Plaintiff.

  d. **Adequacy.** Plaintiff will fairly and adequately protect and represent the interests the Class because (i) Plaintiff has retained competent counsel that have the time, experience, and resources to litigate this case; (ii) Plaintiff is a member of the Class he seeks to represent, his claims are typical of the Class, and he has suffered substantially similar injuries to those suffered by the rest of the Class; (iii) Plaintiff's interest in obtaining monetary relief for their Class is consistent with and not antagonistic to the interests of the Class.

41.    The proposed Class satisfy the requirements of Fed. R. Civ. P. 23(b)(3).

  a. **Predominance**. Common questions predominate over any individual questions because the important and prevalent issues in this case concern Defendant's conduct and its effects, which are common to the Class. Individual issues are minor and may be nothing more than damages calculations pursuant to a formula.

b. **Superiority**. A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages suffered by Plaintiff and the Class, while collectively substantial, are relatively small per Class member compared to the burden and expense required to individually litigate their claims. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Both liability and damages can be determined in one class-wide proceeding.

### Count I - Breach of Contract

42. The Class defined above satisfies the requirements of Rules 23(a) and 23(g).

43. Plaintiff incorporates all prior allegations as if fully stated herein.

44. Defendant contracted with Plaintiff and Class members through Lease Agreements substantially identical to the one attached here as Exhibit A.

45. The Lease Agreements all state, "CARRIER agrees to pay 88% (to hold 12% commission) of gross receipts of each load …" **Ex. A.**

46. The Lease Agreements reflect that the drivers were to receive 88%, and Defendant was to retain 12%, of the actual freight rate that brokers or shippers paid Defendant for the drivers' line haul transportation services, the "gross receipts of each load …"

47. Defendant secretly altered load confirmation sheets to make the load prices appear lower than the prices that Defendant's customers actually paid to Defendant. Defendant then sent

11

the altered load confirmation sheets to Plaintiff and the Class members to make them falsely believe that Defendant was paying them in accordance with their work contracts.

48. Plaintiff and the Class members substantially performed all their obligations under their contracts with the Defendant.

49. Defendant breached the contracts with Plaintiff and the Class members by not paying them based on the real price that Defendant's customers actually paid to Defendant.

50. Defendant, as the party that received load confirmation sheets directly from the brokers, had the sole ability and discretion to provide Plaintiff and Class with copies of the load confirmation sheets without altering them. Defendant abused that discretion by secretly altering the load confirmation sheets to make it appear that the load price was lower than it actually was.

51. Defendant breached its duty of good faith and fair dealing by secretly modifying the original load confirmation paperwork in order to artificially reduce the listed shipping prices and retaining the difference for Defendant's benefit.

## Count II - Truth in Leasing Act

52. Plaintiff incorporates all prior allegations as if fully stated herein.

53. Defendant is a motor carrier licensed with the U.S. Department of Transportation. Plaintiff worked for Defendant as an owner-operator for purposes of TILA.

54. Pursuant to the TILA regulations, Defendant signed equipment leases with Plaintiff and the Class members.

55. Under the TILA regulations, an authorized carrier may perform authorized transportation in leased equipment only if the written lease granting the use of the equipment meets the requirements of 49 C.F.R. § 376.12.

56. Under the regulations, the required lease provisions must be "adhered to and performed by the authorized carrier." *Id.* § 376.12 (introductory paragraph). If a drivers' compensation is based on a percentage of the price of the load, then carriers must provide the driver with copies of the original brokers' load confirmation sheets at or before the time of settlement. *Id*. § 376.12(g).

57. In the Lease Agreement, Defendant agreed to pay Plaintiff and the other owner operator drivers a certain percentage of gross revenue for each load they hauled for Defendant.

58. Defendant falsely represented the actual prices of the loads in order to pay Plaintiff and the other owner-operator drivers less than the amount promised in their Lease Agreements.

59. Defendant failed to provide Plaintiff with copies of the original, unaltered brokers' load confirmations.

60. Defendant did not adhere to the terms of the Lease Agreement.

61. Under 49 U.S.C. §14704(a)(2), Defendant is liable to Plaintiff and the Class for the damages that they suffered on account of Defendant's regulatory violations.

### Count III – Illinois Consumer Fraud and Deceptive Business Practices Act

62. Plaintiff incorporates all prior allegations as if fully stated herein.

63. Defendant deceived Plaintiff and the Class by offering them a load for the price of a 12% dispatch and accounting fee, and then secretly retaining more than 12% of the load.

64. Defendant deceived Plaintiff by lying and under-reporting the gross revenues Defendant received for loads hauled by Plaintiff and the Class. At times, Defendant deceived Plaintiff by sending him altered load confirmation sheets from third party freight brokers.

65. Defendant intended that Plaintiff rely on their reports of the gross revenues so that Defendant could pay Plaintiff and the Class less than the amounts they were owed pursuant to their equipment leases. Plaintiff and the Class relied on these misrepresentations.

66. Defendant engaged in deceptive and unfair practices in the conduct of their business, in violation of 815 ILCS §§ 505/2, 510/2(a), by engaging in the acts and practices alleged herein.

67. Defendant's unfair business practices violated established public policy, including the TILA.

68. Defendant's unfair and deceptive practices and acts were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiff and the Class.

69. Defendant's deceptive business practices happened in the course of trade or commerce.

70. Defendant's deception and unfair business practices proximately caused Plaintiff and the Class to be paid less than the amounts they were owed pursuant to their Lease Agreements.

71. Defendant's deceptive acts were designed to enrich Defendant without regard to the effect on Plaintiff and the Class.

### Count IV – Common Law Fraud

72. Plaintiff incorporates all prior allegations as if fully stated herein.

73. Defendant made false statements to Plaintiff and the Class concerning the actual freight rates, or prices of the loads, that Defendant's customers paid Defendant for drivers' deliveries.

74. Defendant altered load confirmation sheets to make the load prices appear lower than the prices that Defendant's customers actually paid to Defendant.

75. Defendant then sent the fraudulent load confirmation sheets to Plaintiff and the Class to make them falsely believe that Defendant was paying them in accordance with their work contracts.

76. Defendant knowingly provided Plaintiff and the Class with falsified load confirmations.

77. Plaintiff and the Class had no reason to question the authenticity of the fraudulently modified load confirmation sheets.

78. For example, Defendant carefully altered the load confirmations to be virtually identical in appearance to the brokers' original load confirmations, and the load confirmations generally were on the broker's original letter head or otherwise bore the given issuing broker's logo.

79. Plaintiff and the Class reasonably and justifiably relied upon the false load confirmation sheets as though they were authentic.

80. Plaintiff and the Class incurred substantial damages in the form of underpayments for the services they offered because of Defendant's fraud.

81. Defendant's conduct was fraudulent, egregious, and malicious and justifies an award of punitive damages.

## **Prayer for Relief**

Plaintiff, individually and on behalf of the Class, respectfully prays for the following relief:

a. An order certifying the Class as defined above, appointing Plaintiff's counsel as Class Counsel for the Class, and appointing Trent Hunter as class representative on behalf of the Class,

    b.  An award of all economic, monetary, actual, consequential, compensatory, and punitive damages available under the law;

    c.  An award of restitution and disgorgement;

    d.  An award of all equitable relief requested herein;

    e.  An award of reasonable litigation expenses and attorneys' fees;

    f.  An award of pre- and post-judgment interest, to the extent allowable; and

    g.  Other further relief that the Court deems just and reasonable.

## Jury Demand

Plaintiff demands trial by jury on all issues as to which a jury trial is available.

Date: April 28, 2023                          Respectfully submitted,

                                                        /s/ Gregory A. Wilkowski
                                                        Attorney for the Plaintiff

Gregory A. Wilkowski
greg@wilkowskilaw.com
Wilkowski Law LLC
161 N. Clark St., Ste. 1700
Chicago, IL 60601
(773) 828-6225